COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1601**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023ME74

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF J.D.M.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

J.D.M.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: BRYAN D. KEBERLEIN, Judge. *Affirmed.*

¶1      GUNDRUM, P.J.[1]  J.D.M., referred to herein by the pseudonym Josh, appeals from circuit court orders extending his involuntary commitment pursuant to WIS. STAT. § 51.20 for twelve months and allowing for the involuntary administration of medication and treatment during that time.   He contends Winnebago County (the County) did not present sufficient evidence at the jury trial to prove he is dangerous under § 51.20(1)(a)2.c., d., or e.   He also contends the court made insufficient findings to enter the involuntary medication order.  We disagree on both points, and we affirm.

## *Background*

¶2      The following relevant evidence was presented at the October 9, 2023 jury trial on the petition.

¶3      Doctor Jenna Nelson, a psychologist with the Wisconsin Resource Center (WRC), testified that she had been treating Josh since 2021, had most recently seen him at the end of September 2023, and would see him once a month or more frequently if needed.  Josh first came to WRC in a "decompensated state," and in August 2022, he "slowly started to show more decompensation."  Nelson became more concerned for Josh's mental state as "he appeared to be presenting more depressed."  By October of 2022, he "was no longer willing to meet" with Nelson, and WRC moved him back to the acute psychiatric unit for closer monitoring.  Nelson added that Josh was presenting "similar warning signs" to his prior decompensation and became "very irritable towards" Nelson and "not willing to engage further in conversation to discuss his perspective."  One warning

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

sign Nelson discussed was that Josh's cell walls were covered in spit and food, adding that "[t]his was something that was observed in his first episode, when he first came to us, of depressive episode, and then … around this time too." Nelson was concerned that "he was not eating the food himself" but instead "direct[ing it] towards the wall." Relatedly, Nelson observed "[s]trong odors" in Josh's cell from "rotting food and other items that have a rotting smell." The odor was still present when Nelson met again with Josh in November and December 2022.

¶4     When Nelson tried to speak with Josh regarding staff concerns, he would respond with an answer like "I may or may not tell you" and would not give definitive answers. Josh "appeared irritable and was speaking in a louder tone and was not giving clear answers." Nelson stated that "[g]iven the history, this change in presentation, and his lack of cooperation with the questions I was asking, led me to be concerned for his safety for himself and others."

¶5     Nelson agreed that in December 2022, Josh did not have insight into needing to treat his mental health and continued to have issues with hygiene and odors in his cell. She indicated that every month she would try to help him gain insight into his mental health in an attempt to help him "progress[] towards being able to take care of and monitor his mental health independently." She stated that while "[h]e understands his diagnosis[,] he disagrees with the warning signs, which is concerning." She reviewed with Josh the warning signs: he doesn't eat, "his sleep decreases down to two to three hours a night, he starts isolating in his cell more, he starts pacing [in his cell] whereas normally he would be going and attending fitness and engaging in full fitness activities. He enjoys basketball. When he's unwell, he stops playing basketball." Nelson explained that when Josh is well "he's got a brighter affect, he's responding, he's engaging, we're able to

3

have in-depth conversations. A warning sign is when he starts, like, withdrawing."

¶6 At the time of trial, Josh had been referred by Nelson to depression and grief groups. She expressed that he is "falling short" by not applying what he learns in these groups. Nelson stated that Josh is diagnosed with "[m]ajor depression, multiple episodes, with psychotic features," explaining that psychotic features means "[d]istortions in thought. So his thoughts are separating from reality of what is going on around him." As an example, she explained that during Josh's "first episode[] he had beliefs about there being a medical concern specifically related to his neck, and despite medical evidence stating that there was nothing wrong, he was moving his neck fully trying to demonstrate that there was a concern." Josh also believed his food was contaminated with feces.

¶7 Nelson stated that Josh's symptoms are treatable and that at the time of trial his prescribed medications

> [have] helped him get to this point to be able to access these groups and classes. He was not doing that without the medications in place because he was isolating in his cell and he was physically unwell. So now, he's able to meet with myself monthly, engage in meaningful conversations, he's able to attend the groups and classes and fitness with that added. Without the medications, he wasn't able to reach out to receive those.

¶8 Josh had expressed opposition to his commitment, stating that if he was not under commitment at WRC, "he wouldn't reach out for services. He disagrees with the warning signs." He also had expressed that "he does not feel that he gets benefit from [the medication order], despite [the fact] he does really well when he's taking medication." Nelson explained that if Josh is "not on a commitment, there's no one there making sure that he's taking his medication

each month." This is so because Josh "doesn't see the benefits of the medication, he doesn't want to be on the medication, and is not willing to take medications." She stated that "he's wanting to take care of himself, but we've seen this pattern where he's not able to."

¶9 On cross-examination, Nelson agreed that in a July 27, 2023 report, she noted that when Josh is taking his current medication, "his thought process is calmer." She testified that Josh is currently "doing well because of the medication. He can't avail himself to all these other [group therapy] options when he's unwell."

¶10 On redirect examination, Nelson agreed that Josh is "[m]ost definitely not" "well enough to care for himself when he's not medicated." Related to various group therapy options, she stated,

> [h]e was not able to engage in conversation. You can't be in group therapy without being able to, like, talk with the group…. [H]e's isolating to his room. His body was in a very, very weak condition due to the amount of weight he lost. Weight loss in general, you can't attend to group material being presented. It can impact our body in multiple ways ….

¶11 An institution unit supervisor at WRC, Brett VandeWalle, also testified. VandeWalle confirmed that he has noticed "significant differences" when Josh is on medication and when he is not. Josh's hygiene, cleanliness of living quarters, mood with staff, and ability to communicate are "significantly better when he's on medication." When on medication, Josh is "[m]uch happier …, able to take care of himself, able to go off the unit, … go to recreation, socialize with peers, attend different programming…. Just overall, … he's doing a lot better while on meds." "His irritability … is also significantly worse when he's not on his medication…. [H]e paces, he keeps to himself, … sometimes you

5

can ask him a question and he will look right at you and just walk away without responding to any of the staff [or] myself."

¶12    Comparing Josh's cell when on and off of medication, VandeWalle stated that when Josh is off medication, his cell is "very much [in] disarray" and will have "[s]tuff smeared all over his wall.  His room had a foul smell to it." VandeWalle testified that "[i]t looked like a mixture of saliva and food and different things … smeared all over the white wall.  It was … pretty disgusting." "When on medication, [Josh] didn't do that."

¶13    Doctor George Monese, psychiatrist, testified next.  He indicated he had examined Josh "at least on a monthly basis" from fall 2021 through March 2023 and that Josh suffers from "major mood disorder, currently conceptualized as psychotic depression."  He explained that

> when [Josh is] severely depressed, he becomes psychotic. He begins to have false beliefs, like, quote/unquote, food may be poisoned, and not eat that much.  He begins to become completely disorganized not only in his thinking patterns, but also in his behaviors, the way that he communicates with others.  He becomes seclusive.  In other words, socially isolated.  He begins to neglect personal hygiene and so on and so forth.

During the time he was treating Josh, Monese prescribed him the antipsychotic medication paliperidone/Invega, and at some point, an antidepressant, but there were times when Josh was not taking any medications.  Monese would speak with Josh frequently about medications, explaining in personal terms the advantages of Josh receiving medication.  Monese pointed out to Josh how the "clinical manifestation" of his clinical condition he suffered from at the time of his admission "had completely disappeared following the treatment with medications."  Monese gave Josh the example

that since … being started on the appropriate treatment, he is now engaging, he's back to eating his meals, he is able to maintain himself, he's able to participate in activities. In other words, … the dangerousness to self or risk to self has significantly dwindled. In other words, the medications were beneficial to him.

¶14 Monese reviewed with Josh that the "disadvantages really are very rare" and include "weight gain," which Monese said may actually "have been beneficial to [Josh] as a result of improving his eating behaviors as a result of the medication." Josh also "may have some muscle stiffness or maybe other unknown allergic reactions, and none of those were reported to me." He explained there are alternative medications to the long acting injectable paliperidone/Invega, however, "those are given orally and he has to take them as prescribed orally," adding that Josh was not willing to do that "without a medication order." Monese added, "in fact, he has insisted that if there was no medication order, he would stop all medications." Monese stated that he did discuss with Josh other medications to treat psychosis, but "the best choice for him was Invega." When asked if Josh "[was] willing to take those other medications," Monese stated that Josh "was not willing to take any medications whatsoever."

¶15 Monese agreed "there [was] a period of time in which [he was] concerned about [Josh]'s ability to be safe towards himself or others." He explained that "[t]he incidences where he was at high risk of a physical threat to others and himself occurred only and exclusively when he was not under treatment or medicated."

¶16 Specifically related to concerns about Josh's dangerousness toward himself, Monese testified that Josh would "throw[] his throat from left to right for about [a] centimeter diversion from the midline. That is a danger." Josh told Monese he did this because he "ha[d] some sensation that there should be

something in his throat, … that's why he was very grotesquely deviating his throat from both sides in order … to get rid of that sensation that he had in his throat." "[S]ubsequent evaluation, including an ultrasound, revealed no physical abnormality or chemical abnormality that may warrant shifting the throat left, right, whatever, that he was doing to himself." The court explained on the record that to demonstrate for the jury, Monese was "taking his hand with his fingers to the left side of the throat, the thumb to the right side of the throat, and then moving the entirety of the hand from left to right by a couple inches." Monese further explained that

> there are a lot of other sensitive organs that are surrounding the throat or the trachea. If you do that, you can rupture the trachea. You can also disrupt other vessels that go to the brain and cut them off and cause … very—very severe consequences or even death as a result of that.

Monese further described Josh's conduct:

> He puts his hand here to the side on the midline, there, and pushes and pulls to the side, and the other way around. And in doing so … you can disrupt a lot of vital organs. There are arteries that go[] up to the brain. Plenty up there. There are a lot of other vital organs there, including the trachea itself. So you can really damage yourself and die from that as a result, and that is what really alarmed me at that time when I saw him early 2022, at the behest of the nurse practitioner that was working under my supervision.

¶17    Monese also described Josh's

> substantial weight loss … that happened over months as a result of untreated psychosis or depression, during which time, [Josh] progressively restricted his food intake, to the point whereby he lost so much weight that he was at the risk of what we call refeeding syndrome.
>
> … If you are at the risk of refeeding syndrome, you lost so much weight below a certain body mass index. If you eat your food again, your normal food again, you can die from that. So he had reached that clinical stage whereby he

has lost so much weight that he was at a high risk of refeeding syndrome.

Monese explained that because of the weight loss "[w]e did get a temporary [court] order, what we called temporary guardianship, in order to address that particular physical condition that he was in." That order "at least … gave us the tools to be able to manage his physical condition surrounding the starvation that he was going through," but it did not alleviate Monese's concerns regarding Josh's mental health. Taking some "labs" pursuant to the temporary guardianship, Monese was able to determine that "[s]ome of the parameters within the labs were significantly abnormal," which he stated, "could be due to the starvation that he was going through at that time."

¶18 Monese indicated that Josh does not "have insight into his mental illness and need for treatment," adding that Josh "indicated to me directly that he's going to stop the treatment if he['s] not on a court order. He doesn't believe he has a mental illness" and believes he does "better on his own."

¶19 Doctor Konstantin Mikheyev, the attending psychiatrist at WRC, testified next. He had been familiar with Josh for three years but had been treating him as a patient since April 2023, meeting with Josh on average "about every four weeks." Mikheyev confirmed that with the mental illness, Josh suffers a substantial disorder of thought, mood, perception, orientation, and memory. He stated that Josh has "been fairly stable" since April 2023 because "[h]e's been accepting the recommended treatment, except for most recently, I did talk to him about starting an antidepressant, the medication that also helps with sleep. He chose not to take it, but that was his choice. In other words, he's functioning okay."

¶20 When asked what he attributed the improvement in Josh's mental illness symptoms to, Mikheyev responded that it was due to treating Josh with injectable paliperidone/Invega, which "helps organize thoughts and stabilize mood." He added that taking the medication monthly as an injection "has fewer side effects."

¶21 Mikheyev stated that he has seen Josh on medication and off medication. He explained,

> I remember [Josh's] presentation before he was on the medication. He was pretty much mute, nonverbal, wouldn't share much with anyone and with me particularly when I attempted to examine him on a number of occasions. Was withdrawn. He wouldn't really give me the reason why he had this aversion to food, even though I expressed my concerns about his low body mass index and I tried to explain to him the risks of what we call refeeding syndrome, when nutrition is introduced, and how it can adversely affect his metabolism, which could be lethal.

¶22 Mikheyev stated he had spoken to Josh just a week before the trial and testified that

> [a]t this time, he doesn't have the insight into his mental illness. In other words, he doesn't believe he has a mental illness. And his judgment is also inadequate; he lacks appropriate judgment…. He doesn't overtly express that he's not going to take medication. He keeps telling me he doesn't want to be on it. He doesn't say he's not going to take it.

Mikheyev indicated that Josh is not competent to refuse medication at this time, and he "explained to [Josh] that it's very important that I can step in and help him when he completely lacks that insight, help him remain at baseline in his daily functioning." Mikheyev explained that

> [w]ith any major mental illness, when the patient goes off treatment or decompensates, it is more difficult to bring them back to the baseline where they used to be. Every

time there's a setback and fewer medications will be available for getting them back on track to that daily level of daily functioning, and that's the risk.

Mikheyev stated that these concerns are "a part of the … patient education[] about the medication because every time there's a setback, we have to increase the dose, which increases the risk for side effects, and just makes it more difficult."

¶23     Mikheyev indicated that he talked with Josh about the advantages of taking the paliperidone/Invega, adding that such discussion is "a part of each assessment."  He discussed disadvantages and alternatives to paliperidone/Invega as well.  Mikheyev expressed that based on his assessment, Josh is not "capable of applying an understanding of the advantages, disadvantages, and alternatives of" the medication to his own condition, and Josh does not have "appropriate insight and he lacks judgment to make the determination" with regard to using the medication.  He agreed that when Josh is not on medication, his mental illness grossly impairs his judgment, behavior, capacity to recognize reality, and "[h]is ability to meet the ordinary demands of life," adding "[a]nd we've seen that in the past."  Mikheyev testified that while Josh's condition cannot be cured, "it could be affected to the point where he can function appropriately."

¶24     The jury found Josh mentally ill, a proper subject for treatment, and dangerous to himself or others.  Consistent with the jury's verdict, the circuit court entered orders extending Josh's commitment, indicating he is dangerous under the third, fourth and fifth standards.  The court also entered an involuntary medication and treatment order.  Josh appeals.

***Discussion***

¶25 An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See* ***Langlade County v. D.J.W.***, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277. Josh does not dispute that the County established he is mentally ill and a proper subject for treatment. He contends, however, that the County did not present sufficient evidence to support the jury's determination of current dangerousness under the third, fourth, or fifth standards, § 51.20(1)(a)2.c., d., e. *See* ***Portage County v. J.W.K.***, 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509 ("Each extension hearing requires proof of *current* dangerousness.… The County must prove the individual '*is* dangerous.'" (citation omitted)). He also contends the circuit court erred in entering the involuntary medication and treatment order. For the following reasons, we disagree and affirm.

Recommitment Order

¶26 Both parties direct us to paragraph twenty-one from ***Outagamie County v. Michael H.***, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603, for our standard of review. In relevant part, our supreme court stated there that when a committee challenges "the sufficiency of evidence to support a jury verdict," the verdict "must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it." *Id.*, ¶21 (citation omitted). Further, we are to "*search the record for credible evidence that sustains the jury's verdict*, not for evidence to support a verdict that the jury could have reached but did not…. Similarly, if the evidence gives rise to more than one reasonable inference, *we accept the particular inference reached by the jury*." *Id.* (citation omitted).

We are to "uphold the jury verdict 'even though [the evidence] be contradicted and the contradictory evidence be stronger and more convincing.'" *Id.* (alteration in original; citation omitted).[2]

¶27    Here, the evidence supported the jury's determination that Josh was dangerous under the third standard "by way of the recommitment alternative," i.e., under WIS. STAT. § 51.20(1)(a)2.c. and (1)(am). *See Sauk County v. S.A.M.*, 2022 WI 46, ¶32, 402 Wis. 2d 379, 975 N.W.2d 162. Pursuant to these two statutory provisions, the County had to prove a substantial likelihood, based on Josh's treatment history, that if treatment were withdrawn, "he would again face 'a substantial probability of physical impairment or injury to himself [or other individuals].'" *Id.* (citation omitted). The County easily met that as the testimony showed a significant difference in Josh's functioning on and off medication. Specifically, the evidence showed that due to his mental illness, when off medication, Josh engages in dangerous self-harming conduct, including starving himself and also manually manipulating/pulling/"very grotesquely deviating his throat" in such a way that it causes great danger to himself.

---

[2] At one point, citing *Langlade County v. D.J.W.*, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277, Josh correctly notes that our supreme court has stated that "[w]hether the evidence was sufficient to satisfy the statutory standard for dangerousness is a legal question that this Court reviews de novo." In that case, our supreme court held that "[a] determination of dangerousness is not a factual determination, but a legal one based on underlying facts. The court of appeals thus erred by applying the standard of review for findings of fact to a legal determination of dangerousness." *Id.* Despite this holding, Josh agrees with the County that we should look to paragraph twenty-one of *Outagamie County v. Michael H.*, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603, to guide us in our review, and he makes no argument that we should view the holding of *Michael H.* differently because of *D.J.W.* Moreover, eight months after *D.J.W.*, our supreme court approvingly noted that "the [United States Supreme] Court stated … that lay juries and courts[, not just experts,] can 'sensibly' arrive at … conclusions" as to "whether or not an individual is dangerous." *State v. Stephenson*, 2020 WI 92, ¶23, 394 Wis. 2d 703, 951 N.W.2d 819. Thus, we adhere to our supreme court's standard articulated in *Michael H.*, supported by *Stephenson*, and embraced by both parties here.

¶28    Doctor Monese testified that by manipulating his throat as he did, Josh could "rupture the trachea" and/or "disrupt other vessels that go to the brain and cut them off and cause … very severe consequences or even death." As to the starvation, Monese testified to Josh's

> substantial weight loss … as a result of untreated psychosis or depression, during which time, [Josh] progressively restricted his food intake, to the point whereby he lost so much weight that he was at the risk of what we call refeeding syndrome.
>
> … If you are at the risk of refeeding syndrome, you['ve] lost so much weight below a certain body mass index. If you eat … your normal food again, you can die from that. So he had reached that clinical stage whereby he has lost so much weight that he was at a high risk of refeeding syndrome.

The concern for Josh's health and life was so significant that Monese sought a temporary guardianship order "to address that particular physical condition that he was in." Once he secured the guardianship, labs were taken from Josh, which showed that "[s]ome of the parameters … were significantly abnormal." Doctor Mikheyev, Josh's current treating psychiatrist, also testified to his concerns with Josh's low body mass index "before he was on the medication." Being "withdrawn," Josh would not tell Mikheyev "why he had this aversion to food," even though Mikheyev expressed his "concerns about his low body mass index" and "tried to explain to him the risks of … refeeding syndrome, when nutrition is introduced, and how it can adversely affect his metabolism, which could be lethal." Monese further informed the jury that "[t]he incidences where [Josh] was at high risk of a physical threat to others and himself occurred only and exclusively when he was not under treatment or medicated."

¶29    Josh claims the evidence did not show "a pattern of conduct which warranted a substantial probability of physical impairment of himself or another."

14

This is incorrect. The County established a pattern through evidence of Josh's throat manipulation and starvation. There was unquestionably sufficient evidence to support the jury's verdict that Josh is dangerous under the third standard.

Medication Order

¶30 Josh contends the evidence presented at the trial hearing was insufficient to support the circuit court's determination that he was not competent to decide whether to accept medication. He says he merely "disagreed" with the doctors' recommendations and such disagreement did not render him incompetent. The evidence, however, showed much more than mere disagreement.

¶31 "[U]nder WIS. STAT. § 51.61, a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Outagamie County v. Melanie L.*, 2013 WI 67, ¶53, 349 Wis. 2d 148, 833 N.W.2d 607. "[T]he County bears the burden of proof on the issue of competency in a hearing on an involuntary medication order." *Id.*, ¶94. As relevant to this case, the County establishes a person's incompetency to refuse medication by proving by clear and convincing evidence that due to mental illness

> and after the advantages and disadvantages of and alternatives to accepting the particular medication ... have been explained to the individual, … the following is true: … [t]he individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

*See* § 51.61(1)(g)3., 4.b.; WIS. STAT. § 51.20(13)(e). In *Melanie L.*, our supreme court rephrased this requirement as "requir[ing] a person to *make a connection between* an expressed understanding of the benefits and risks of medication and the person's own mental illness." 349 Wis. 2d 148, ¶71.

¶32    Josh's treating psychologist for years, Dr. Nelson, testified that Josh was currently doing well "because of the medication," but "he doesn't see the benefits" of it and is not willing to take it.  Doctor Monese testified that despite explaining to Josh the advantages, disadvantages, and alternatives to his medication, Josh is not willing to accept the medication "without a medication order" and "insisted that if there was no medication order, he would stop all medications."  Monese agreed that Josh "does [not] have insight into his mental illness and need for treatment," noting that Josh "doesn't believe he has a mental illness" and believes that "he's doing better on his own."  Doctor Mikheyev, who spoke with Josh just a week before the trial, also testified that Josh "doesn't have the insight into his mental illness.  In other words, he doesn't believe he has a mental illness.  And …  he [also] lacks appropriate judgment."  Mikheyev indicated that Josh is "[not] competent to refuse medication."  Mikheyev testified that he explained to Josh the advantages, disadvantages, and alternatives of paliperidone/Invega but indicated Josh is "[not] capable of applying an understanding of the advantages, disadvantages, and alternatives of that medication to his own condition."  He stated Josh does not "ha[ve] appropriate insight and he lacks judgment to make the determination" whether or not to take the medication.  He agreed that when Josh is not on the medication, his "mental illness grossly impair[s]" his judgment, behavior, capacity to recognize reality, and "ability to meet the ordinary demands of life."

¶33    In *Melanie L.*, our supreme court stated that it is "logical[]" that "if a person cannot recognize that he or she has a mental illness, ... the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness."  349 Wis. 2d 148, ¶72.  As the evidence showed, that is the case here.

16

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.